IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AUROMEDICS PHARMA LLC, and SCIDOSE LLC, <br><br> Plaintiffs, <br><br> v. <br><br> INGENUS PHARMACEUTICALS, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) C.A. No. 20-1235-CFC-JLH ) ) ) ) ) ) |

## REPORT & RECOMMENDATION

In this action for patent infringement, trade secret misappropriation, and unjust enrichment, Defendant Ingenus Pharmaceuticals, LLC moves to dismiss the non-patent claims (Counts III and IV of the Complaint) asserted by Plaintiff SciDose LLC on the basis that they must be resolved in arbitration. I agree with Ingenus that the parties agreed to arbitrate the non-patent claims. But I disagree that dismissal is the appropriate course of action at this juncture. Instead, I recommend that Counts III and IV be STAYED pending the outcome of arbitration between the parties.

I.  **BACKGROUND**[1]

In March 2012, SciDose and Ingenus "began collaborating to develop a lyophilized (powdered) injectable formulation of cyclophosphamide." (D.I. 1 ("Compl.") ¶ 33.) To facilitate their collaboration, on March 13, 2012, SciDose and Ingenus entered into a "Development and License Agreement" (the "2012 Agreement").[2] (*Id.* ¶¶ 33, 41; *see also* D.I. 14, Ex. 1 at 1 (2012 Agreement).)

---

[1] I assume the facts alleged in Complaint to be true for purposes of resolving the pending motion.

[2] The Complaint did not attach the 2012 Agreement, but that agreement is properly considered regardless of whether the Court considers the pending motion as a motion to dismiss,

The 2012 Agreement sets forth various duties of the parties with respect to the collaboration. Among other things, Ingenus was responsible for "financial[] support [for] the development of the PRODUCT" and preparation of an FDA drug application. (Compl. ¶ 33; 2012 Agreement, § 3.1.) SciDose was to provide, among other things, "[f]ormulation and development of a PRODUCT." (Compl. ¶ 33; 2012 Agreement, § 3.2.) The 2012 Agreement defines "PRODUCT" as a "lyophilized" (*i.e.*, freeze-dried, powdered) formulation of cyclophosphamide. (2012 Agreement, § 1.31.)

Article 7 of the 2012 Agreement is titled "<u>Confidentiality</u>." Section 7.1 provides (in part):

> For the TERM and for a period of five (5) years thereafter, each PARTY shall maintain in confidence all information and materials of the other PARTY (including, but not limited to, KNOW-HOW and samples of the PRODUCT) disclosed or provided to it by the other PARTY (either pursuant to this AGREEMENT or the NON-DISCLOSURE AGREEMENT) and identified as confidential in writing or, if disclosed verbally or by observation, summarized in writing and submitted to RECIPIENT within thirty (30) days of the oral or visual disclosure thereof (together with all embodiments thereof, the "CONFIDENTIAL INFORMATION").

(2012 Agreement, § 7.1; *see also* Compl. ¶ 41.) "KNOW-HOW" is defined as:

> all technical, scientific and other know-how, data, materials, information, trade secrets, ideas, formulae, inventions, discoveries, processes, machines, manufactures, compositions of matter, improvements, protocols, techniques, works of authorship, and results of experimentation and testing (whether or not patentable) in written, electronic, oral or any other form.

---

a motion to compel arbitration, or a motion to stay pending arbitration. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court may consider documents integral to or explicitly relied upon in the complaint when resolving motion to dismiss under Fed. R. Civ. P. 12(b)(6)); *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773-74 (3d Cir. 2013) (court may consider documents relied upon in the complaint and apply Rule 12(b)(6) standard when assessing arbitrability (absent circumstances not present here)). (*See also* Compl. ¶¶ 41 (referring to "confidentiality provisions" set forth in "agreement to collaborate"); 36 (referring to "confidentiality and/or nondisclosure agreements"); 37 (referring to "confidentiality agreements"); 75-82 (referring to Ingenus's alleged breach of "confidentiality agreements" and "confidentiality obligations" in connection with trade secret misappropriation claim).

(2012 Agreement, § 1.22.)

The 2012 Agreement includes three other provisions of note. Section 17.13 is titled "<u>Arbitration</u>," and it provides (in part):

> All disputes arising out of, or in connection with, the interpretation, application or enforcement of this Agreement shall be settled by final and binding arbitration by a sole arbitrator appointed by mutual consent of the Parties. Such arbitration shall be conducted in city of New York, New York, USA pursuant to the Commercial Arbitration rules of the American Arbitration Association in effect at the time the arbitration is commenced. . . . In the event of a breach related to non-competition, then the non-breaching Party shall be entitled to immediate injunctive relief in addition to all other remedies that may be available to it related to the breach. The Parties agree that injunctive relief is not only appropriate but necessary under the circumstances of such a breach due to the irreparable harm that will be caused to the non-breaching Party.

(*Id.* § 17.13.)

Section 17.9 is titled "<u>Governing LAW</u>," and it reads (in part):

> This AGREEMENT shall be governed by and construed in accordance with the LAWS of the State of Delaware without regard to its or any other jurisdiction's choice of LAW rules. Any disputes under this AGREEMENT shall be brought in the state or federal courts located in Delaware.

(*Id.* § 17.9.)

Finally, § 17.8 is titled "<u>Entire Agreement</u>," and it states that the 2012 Agreement "and Schedules attached [thereto] constitute the entire understanding between the PARTIES and supersedes any prior or contemporaneous written or oral understanding, negotiations or agreements between and among them respecting the subject matter hereof." (*Id.* § 17.8.)

Later in 2012, Ingenus expressed to SciDose that a lyophilized formulation of cyclophosphamide might not be commercially viable. (Compl. ¶ 34.) In response, SciDose

3

disclosed to Ingenus "the idea for liquid cyclophosphamide formulations, which SciDose explained would have advantages over a lyophilized product." (*Id.*)

To facilitate the development of the new liquid product, SciDose disclosed "trade secrets and other proprietary or confidential information relating to SciDose's development of new liquid formulations" of the product. (*Id.* ¶ 35.) Among the information disclosed were "formulations, method validation, testing protocols, and stability data" relating to SciDose's liquid formulations. (*Id.*) SciDose disclosed this information "in documents marked 'Confidential,' and . . . instructed [Ingenus] to treat the information as confidential." (*Id.*) According to the Complaint, Ingenus was obligated to keep the information confidential pursuant to its "confidentiality agreements" with SciDose. (*Id.* ¶¶ 36-37, 41, 75-77, 81.)

In January 2014, Ingenus informed SciDose that it no longer wished to pursue development of a lyophilized or a liquid cyclophosphamide formulation, and it sought to end the collaboration. (*Id.* ¶ 40.) On January 22, 2014, the parties executed a document titled "Mutual Release and Settlement Agreement" (the "2014 Settlement Agreement"). (*Id.* ¶ 41; D.I. 14, Ex. 2 § II.1 ("2014 Settlement Agreement").) The 2014 Settlement Agreement released the parties from many of the obligations set forth in the 2012 Agreement, but it expressly provided that certain obligations in the 2012 Agreement would remain in force, including Article 7 (the confidentiality provisions), § 17.9 (the governing law provision), and § 17.13 (the arbitration provision).³ (Compl. ¶ 41; 2014 Settlement Agreement § II.1.) The 2014 Settlement Agreement also contained mutual covenants not to sue and mutual releases. (*Id.* §§ II.6, II.7.)

---

³ The 2014 Settlement Agreement was not attached to the Complaint, but it is appropriate for the Court to consider it. *See* n.2, *supra*. (*See also* Compl. ¶ 41 (alleging that the parties "terminated the agreement to collaborate" in 2014 but that they "expressly provided that the confidentiality provisions remained in force").)

4

Section 11 of the 2014 Settlement Agreement is titled "<u>Forum selection; Choice of law</u>" and it provides (in part):

> This Agreement is entered into and shall be construed in accordance with the laws of the state of Delaware. All disputes arising out of, or in connection with, the interpretation, application or enforcement of this Agreement shall be settled by final and binding arbitration by a sole arbitrator appointed by mutual consent of the parties. Such arbitration shall be conducted . . . pursuant to the Commercial Arbitration rules of the American Arbitration Association in effect at the time the arbitration is commenced."

(*Id.* § II.11.)

At some point later (the Complaint does not specify when), Ingenus submitted a New Drug Application to the FDA seeking approval to market a liquid cyclophosphamide formulation. (Compl. ¶ 14.) Ingenus's NDA "received FDA approval on July 30, 2020." (*Id.* ¶ 15.)

This action followed. Counts I and II allege infringement of Auromedics' patent covering a liquid cyclophosphamide formulation. Count III alleges trade secret misappropriation pursuant to the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 *et seq* ("DUTSA"). SciDose claims that Ingenus improperly used SciDose's trade secrets in the process of developing Ingenus's own liquid cyclophosphamide formulation. (Compl. ¶¶ 73-83; *see also id.* ¶¶ 42-44.) Count IV alleges that Ingenus was "unjustly enriched" by its use of SciDose's confidential information. (Compl. ¶¶ 87-90.)

On December 7, 2020, Ingenus filed the pending motion to dismiss Counts III and IV of the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (D.I. 13.) The motion makes four arguments: (1) that SciDose must arbitrate Counts III and IV pursuant to the arbitration clauses in the 2012 Agreement and the 2014 Settlement Agreement; (2) that Counts III and IV are barred by the release and covenant not to sue in the 2014 Settlement Agreement; (3) that Count III fails to state a claim because SciDose did not plausibly allege that Ingenus

misappropriated any trade secrets; and (4) that the unjust enrichment claim of Count IV is preempted by DUTSA.  Because I conclude that the parties agreed to arbitrate the arbitrability of Counts III and IV, I do not reach Ingenus's remaining arguments.

## II. DISCUSSION

### A. The parties agreed to refer disputes regarding arbitrability to the arbitrator.

"The Federal Arbitration Act (FAA) reflects the 'national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.'" *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  It requires that the Court, "upon being satisfied that [an] issue involved in [a] suit or proceeding is referable to arbitration" under an arbitration agreement, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3.

To determine whether an issue in a suit or proceeding is "referable to arbitration," courts "must consider two 'gateway' questions: (1) 'whether the parties have a valid arbitration agreement at all' (*i.e.*, its enforceability), and (2) 'whether a concededly binding arbitration clause applies to a certain type of controversy' (*i.e.*, its scope)."  *Remicade,* 938 F.3d at 519 (quoting *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416-17 (2019)).  Subject to certain exceptions, state law governs both questions.  *Id.* at 522; *Jaludi v. Citigroup*, 933 F.3d 246, 254 (3d Cir. 2019).

In this case, the parties do not dispute the enforceability of the arbitration provisions set forth in the 2012 Agreement and the 2014 Settlement Agreement.  The parties do dispute the second question, that is, whether SciDose's trade secret and unjust enrichment claims fall within the scope of those clauses, which provide for arbitration of "[a]ll disputes arising out of, or in connection with, the interpretation, application or enforcement" of those agreements.

6

Before that second question can be answered, however, the Court must resolve the parties' preliminary dispute about *who* should be answering it—the Court or an arbitrator. In other words, the Court must decide whether the parties agreed to arbitrate arbitrability. Ingenus says they did. SciDose says they did not.

I agree with Ingenus. According to the U.S. Supreme Court, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear' and 'unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (*quoting AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). The Third Circuit has observed "that virtually every circuit to have considered the issue has determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016); *see also Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 n.2 (3d Cir. 2020) (declining to decide whether incorporation of the AAA rules always means that the parties agreed to arbitrate arbitrability, but holding that it did in that case because there was nothing else in the contract that "mudd[ied] the clarity of the parties' intent to delegate"); *Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, No. CV 18-698-RGA, 2018 WL 4905593, at *2 (D. Del. Oct. 9, 2018) (incorporation of AAA rules is clear and unmistakable evidence that arbitrability is to be determined by the arbitrator).

In this case, the arbitration provisions in both agreements incorporate the AAA arbitration rules. That is clear evidence that the parties intended to refer the question of arbitrability to an arbitrator.

I reject SciDose's contention that the Delaware forum selection clause set forth in § 17.9 of the 2012 Agreement "refutes any 'clear and unmistakable' intent to arbitrate arbitrability." (D.I.

7

22 at 9.) As Ingenus points out, there is nothing inconsistent between an arbitration obligation and a forum selection clause. Since arbitration decisions are not self-effectuating, a forum selection clause acts to dictate where any action to enforce an arbitration can be filed.[4,5] *Cf. Patten Sec.*

---

[4] SciDose also contends that this Court should look to state, not federal, precedent to assess the parties' intent regarding who should decide substantive arbitrability (*See* Tr. 27:11-28:1; D.I. 22 at 8-9). I disagree. *See First Options*, 514 U.S. at 944. But even if SciDose were right, it would not change the result. The Delaware Supreme Court has adopted "the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator" where "the arbitration clause generally provides for arbitration of all disputes." *James & Jackson, LLC v. Willie Gary*, LLC, 906 A.2d 76, 80 (Del. 2006).

SciDose suggests that the arbitration clauses here—which require arbitration of *all* disputes arising out of, or in connection with, the interpretation, application or enforcement of the agreements—does not provide for arbitration of "all" disputes within the meaning of *James & Jackson*. I reject that argument. All means all. *See id.* at 81 n.9. And, unlike the arbitration clause in *James & Jackson*, the clause in this case does not have a carve-out permitting the parties to seek certain equitable remedies in "court." *Id.* at 81. (It appears to be an open question under federal law whether the presence of such a carve out reserves any arbitrability questions for the court where the contract otherwise suggests that the parties agreed to arbitrate arbitrability. *See Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 280 (5th Cir. 2019) (holding that arbitrability was not delegated to arbitrator notwithstanding arbitration clause's reference to AAA rules, where there was a carve-out exempting actions seeking injunctive relief from arbitration), *cert. granted*, 141 S. Ct. 107 (2020), *and cert. denied*, 141 S. Ct. 113 (2020), *and cert. dismissed as improvidently granted sub nom. Henry Schein, Inc. v. Archer & White Sales*, *Inc.*, 141 S. Ct. 656 (2021).) SciDose's reliance on *360 Campaign Consulting, LLC v. Diversity Communication, LLC* is inapposite, as the arbitration clause in that case only applied to certain types of disputes between certain parties, and it provided that other disputes should be brought in Delaware courts. No. 2019-0807-MTZ, 2020 WL 1320909, at *4 (Del. Ch. Mar. 20, 2020) ("The LLC Agreement contemplates that other disputes—i.e., disputes not between Members or not arising out of the LLC Agreement—will be adjudicated by courts, not arbitrators.").

[5] If the Court agrees with my conclusion that the parties agreed to arbitrate the question of arbitrability, I recommend that the Court decline to address the scope question. *Cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529–30 (2019) (courts may not decide an arbitrability question where arbitrability is delegated to an arbitrator, even if the argument for arbitration is wholly groundless); *AT & T Techs.*, 475 U.S. at 650 (courts "have no business" deciding issues that the parties agreed to arbitrate). Accordingly, if the Court agrees with my analysis above, it need not and should not reach the remaining issues addressed in this footnote.

If the Court disagrees with my conclusion that the parties agreed to have the arbitrator determine substantive arbitrability, I would still recommend that Counts III and IV be referred to arbitration because I think that SciDose's trade secret and unjust enrichment claims fall within the scope of the arbitration clause. As mentioned above, state law generally applies to the

determination of whether an arbitration clause applies to a certain type of controversy. Under Delaware law,

> [w]hen the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. . . . If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.

*Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 157–58 (Del. 2002). "Any doubt as to arbitrability is to be resolved in favor of arbitration." *SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.3d 758, 761 (Del. 1998).

The arbitration clauses here are broad: they require arbitration of all disputes arising out of, or in connection with, the interpretation, application or enforcement of the agreements. *See id.* (arbitration clause covering "any dispute, controversy, or claim arising out of or in connection with" the agreement "signaled an intent to arbitrate all possible claims that touch on the rights set forth in the contract"); *see also E. Hedinger AG v. Brainwave Science, LLC*, 363 F. Supp. 3d 499, 508–09 (D. Del. 2019) (similar).

SciDose's trade secret and unjust enrichment claims fall within the scope of the broad arbitration clause. To determine whether the claims at issue "bear on the duties and obligations" of the agreements such that they are covered by the arbitration clause, the court must determine whether the claims "would be independently and separately assertable" had there been no agreements between the parties. *Parfi*, 817 A.2d at 156–57.

SciDose's trade secret misappropriation claim arises under DUTSA, which (in general) defines trade secret misappropriation as the disclosure or use of a trade secret that was either acquired by improper means or acquired "under circumstances giving rise to a duty to maintain its secrecy or limit its use." 6 Del. C. § 2001(2). SciDose's Complaint does not allege any facts suggesting that Ingenus obtained trade secrets using improper means (*e.g.*, there is no allegation that Ingenus hacked into SciDose's computers and stole its secret liquid cyclophosphamide formulation); rather, SciDose alleges that it shared its trade secrets with Ingenus subject to an obligation of confidentiality. And the Complaint alleges that the obligation of confidentiality arose from the agreements between the parties. (*See, e.g.*, Compl. ¶ 37 ("SciDose required [Ingenus] to maintain in confidence SciDose materials disclosed or provided to Defendant, including by entering into confidentiality agreements with [Ingenus]."; *id.* ¶ 76.). Because Ingenus's duty of confidentiality arose from the agreements, SciDose's claim for misappropriation—which relies on that contractual duty—bears on the duties and obligations created by those agreements. Thus, even if the question of arbitrability had not been delegated to the arbitrator, I would nevertheless conclude that the trade secret claim is subject to arbitration.

I reject SciDose's contention that the agreements only cover the exchange of confidential information relating to lyophilized, not liquid, formulations of cyclophosphamide. SciDose points out that the definition of "SCIDOSE KNOW-HOW" in the 2012 Agreement encompasses only information relating to lyophilized formulations. But the confidentiality obligations in the 2012 Agreement do not refer to "SCIDOSE KNOW-HOW," nor are they limited to "KNOW-HOW." (*See* 2012 Agreement § 7.1 (defining "Confidential Information" as "all information and materials

9

*Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, 407 (3d Cir. 1987); *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 284–85 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287 (2010).

B.        **Counts III and IV should be stayed.**

Ingenus contends that appropriate disposition of Counts III and IV is for the Court to dismiss them for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). I disagree. An agreement to arbitrate a particular claim does not deprive a court of subject matter jurisdiction over that claim.[6] *Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d 74, 78

---

of the other PARTY (including, but not limited [to] KNOW-HOW and samples of the PRODUCT) disclosed or provided to it by the other PARTY (either pursuant to this AGREEMENT or the NON-DISCLOSURE AGREEMENT) . . . .")

I also reject SciDose's assertion that Ingenus's duty to maintain confidentiality arose, not from the parties' agreements, but from a "course of dealing" between the parties. (D.I. 22 at 6.) For one thing, SciDose's argument conflicts with its own Complaint, which expressly refers to "confidentiality agreements" as being the source of Ingenus's obligation of confidentiality. (*See, e.g.*, Compl. ¶¶ 36–37, 41, 75–77, 81.) SciDose cites cases for the proposition that courts assessing misappropriation claims may imply a duty of confidentiality from the circumstances of the parties' relationship in the absence of a confidentiality agreement. *See, e.g., Beard Rsh., Inc. v. Kates*, 8 A.3d 573, 596 n.147 (Del. Ch. 2010), *aff'd sub nom. ASDI Inc. v. Beard Rsh.*, 11 A.3d 749 (Del. 2010). But whether a court might have implied a duty of confidentiality in the absence of a written agreement is beside the point. The parties in this case entered into written confidentiality agreements. Those agreements delineate the terms of the parties' confidentiality obligations, and they disclaim any other understandings. (2012 Agreement, Article 7, § 17.8; 2014 Settlement Agreement §§ II.1, II.4, II.12.) SciDose cannot escape the effect of the arbitration clauses in those agreements on the basis that a court might have implied a duty of confidentiality had there been no agreements.

SciDose's unjust enrichment claim is based on the same underlying conduct as SciDose's misappropriation claim, and any assessment of the claim will require analysis of the parties' rights and obligations in the 2012 Agreement and the 2014 Settlement Agreement. Thus, if the question of arbitrability had not been delegated to the arbitrator, I would conclude that the unjust enrichment claim is also subject to arbitration.

[6] Ingenus cites a state court case for the proposition that the Court lacks subject matter jurisdiction but, of course, a state court's determination of its own subject matter jurisdiction has no bearing on this Court's jurisdiction. Ingenus also cites *Wright v. Early Warning Sys., Inc.*, C.A. No. 10-988-GMS, 2012 WL 479310 (D. Del. Feb. 22, 2012), in which the court dismissed a case for lack of subject matter jurisdiction based on the parties' agreement to arbitrate. *Wright* is not binding authority. Moreover, *Wright* cites *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d

10

(D. Del. 2003); *cf. Nationwide Ins. Co. of Columbus, Ohio v. Patterson*, 953 F.2d 44, 45 n.1 (3d Cir. 1991).

Ingenus alternatively requests that the Court dismiss Counts III and IV under Rule 12(b)(6). SciDose responds that, if the Court determines that if those claims are arbitrable, the Court should stay those claims instead of dismissing them. (Tr. 41:4–42:11.)

Ingenus points out that "courts in this district have found that 'district courts may dismiss an action if all the issues raised are arbitrable and must be submitted to arbitration.'" *E. Hedinger AB*, 363 F. Supp. 3d at 505 (quoting *McNeal v. Glazam*, C.A. No. 17-1397-RGA, 2019 WL 4109266, at *5 (D. Del. Aug. 29, 2018)). But I do not think that dismissal is the appropriate disposition in this particular case, for four reasons.

First, the language of the FAA refers to a "stay," not a dismissal. 9 U.S.C. § 3. Second, the Third Circuit has stated that "the plain language of § 3 affords a district court no discretion to dismiss a case" subject to arbitration where one of the parties desires a stay. *See Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he statute clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded.").[7]

Third, as explained above, I conclude that the parties agreed to arbitrate the question of substantive arbitrability. Thus, the Court need not (and should not) decide whether Counts III and IV are in fact arbitrable—that is a question reserved for the arbitrator. Because we don't yet have the answer about whether those claims belong here or in arbitration, it would, in my view, be

---

Cir. 1999) for the proposition that an arbitration agreement deprives the court of jurisdiction, but that case said nothing of the sort.

[7] I recognize that, in *Lloyd*, the party seeking the stay was the party who believed that the matter should be referred to arbitration. That is not the case here, but I do not think it matters.

inappropriate to dismiss them at this stage. It makes more sense to stay the case while the arbitrator makes their determination.

Fourth, Ingenus is going to be defending the patent infringement claims in federal court anyway and I do not think it is prejudiced by staying the non-patent claims as opposed to dismissing them. Indeed, a stay may result in efficiencies for the parties and the Court. As the Third Circuit has explained,

> [T]he District Court has a significant role to play under the FAA even in those instances in which the District Court orders the arbitration of all claims. Even in those instances, the parties are entitled to seek the Court's assistance during the course of arbitration. For example, the FAA allows arbitrating parties to return to court for resolution of disputes regarding the appointment of an arbitrator or the filling of an arbitrator vacancy, 9 U.S.C. § 5. Similarly, parties may ask the court to compel the attendance of witnesses, or to punish the witnesses for contempt, 9 U.S.C. § 7. Then, after an arbitration award is rendered, a party is entitled to seek relief in the District Court in the form of a judgment on the award or an order vacating or modifying the award. *See* 9 U.S.C. §§ 9, 10, 11. If the plaintiff's case has been dismissed rather than stayed, the parties will have to file a new action each time the Court's assistance is required, with the attendant risk of having their case assigned to a new judge. On the other hand, if the court enters a stay of the action and retains jurisdiction, then proceedings under §§ 5, 7, 9, 10, or 11 may be expedited, as the parties may simply return [] to the same district judge presiding over the plaintiff's case.

*Lloyd*, 369 F.3d at 270. Those considerations counsel a stay here.

No arbitration is currently pending, and Ingenus may move to lift the stay and dismiss the non-patent claims if SciDose fails to pursue its claims in arbitration. Conversely, SciDose may move to lift the stay if the arbitrator determines that those claims are not arbitrable.

### III. CONCLUSION

For the reasons set forth above, I recommend that Ingenus's Motion to Dismiss be DENIED insofar as it requests dismissal. But I agree with Ingenus that the parties agreed to delegate the

question of arbitrability of Counts III and IV to an arbitrator, and I therefore recommend that the Court STAY those counts "until [] arbitration has been had in accordance with the terms of the [parties] agreement[s]." 9 U.S.C. § 3.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated: July 20, 2021

_____
Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE